Case No. 23-20570

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

MEGALOMEDIA INCORPORATED; MEGALOMEDIA STUDIOS, L.L.C.;
MANSFIELD FILMS, L.L.C.; DBA HOLDINGS, L.L.C.,
*Plaintiffs-Appellants*

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
*Defendant-Appellee*
_____

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:20-CV-1644
_____

BRIEF OF APPELLANTS
_____

Jane M. N. Webre
Texas Bar No. 21050060
jwebre@scottdoug.com
Santosh Aravind
Texas Bar No. 24095052
saravind@scottdoug.com
Anthony Arguijo
Texas Bar No. 24079781
aarguijo@scottdoug.com
SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado St., Suite 2400
Austin, TX 78701
512-495-6300—Tel.
512-495-6399—Fax

COUNSEL FOR APPELLANTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

MEGALOMEDIA INCORPORATED; MEGALOMEDIA STUDIOS, L.L.C.;
MANSFIELD FILMS, L.L.C.; DBA HOLDINGS, L.L.C.,
*Plaintiffs-Appellants*

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
*Defendant-Appellee*
_____

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants:**

Megalomedia, Inc.
Megalomedia Studios, LLC
Mansfield Films, LLC
DBA Holdings, LLC

**Counsel for Plaintiffs-Appellants**:

Jane Webre
Steve McConnico
Santosh Aravind
Anthony Arguijo
Scott Douglass & McConnico LLP
Austin, Texas

**Defendant-Appellee:**

Philadelphia Indemnity Insurance Company

**Counsel for Defendant-Appellee**

Stephen A. Melendi
Matthew Rigney
Grant Martin
Tollefson Bradley Mitchell & Melendi, LLP
Dallas, Texas

March 21, 2024.                    */s/ Jane Webre*
                                   Jane Webre

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. Argument will permit counsel to address the legal questions and record at issue in this appeal. Appellants respectfully submit that oral argument would significantly aid the Court's decisional process and the ultimate resolution of this appeal. 5th Cir. R. 28.2.3; *see* Fed. R. App. P. 34(a).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

INDEX OF AUTHORITIES.............................................................................. viii

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF ISSUES ...................................................................................2

STATEMENT OF THE CASE...............................................................................3

    A.     Statement of Facts ..................................................................................3

           1.     Megalomedia seeks general liability insurance coverage from Philadelphia. ......................................................................4

           2.     Philadelphia informs Megalomedia that it is "okay with" providing full general liability coverage for Megalomedia's non-dangerous productions but not for its dangerous "reality" shows. ........................................................6

           3.     Megalomedia seeks further clarification of what Philadelphia considers to be a "reality show." ..........................9

           4.     In 2013, Philadelphia restates its position that only shows with the element of danger would be excluded "reality shows" as distinguished from Megalomedia's other productions...............................................................................11

           5.     Megalomedia repeatedly applies for coverage for *My 600-lb Life*, and Philadelphia never rejects Megalomedia's applications as it did with the excluded, dangerous "reality shows."...................................................................................13

           6.     Philadelphia denies coverage after Megalomedia tenders a general liability claim based on *My 600-lb Life*. ......................14

    B.     Procedural History..................................................................................14

SUMMARY OF ARGUMENT ...........................................................................16

STANDARD OF REVIEW ........................................................................18

ARGUMENT .......................................................................................19

   A.   The term "reality show" is ambiguous and must be construed in favor of Megalomedia. ......................................................19

       1.   A contractual term is ambiguous if it is subject to more than one reasonable interpretation. ...........................................19

       2.   Ambiguous terms in an insurance contract must be construed in favor of the insured. .............................................21

       3.   The plain, ordinary meaning of the term "reality show" establishes that it is subject to more than one reasonable interpretation. ...........................................................21

       4.   Industry custom supports a finding that the term "reality show" is subject to more than one reasonable interpretation. ...........................................................25

       5.   The parties' course of performance confirms that the term "reality show," as used in the exclusion, would not encompass Megalomedia's documentary-type, weight-based shows. ............................................................27

       6.   The Court should render judgment in favor of Megalomedia on its breach-of-contract claim. .........................29

   B.   If the policy does not provide coverage, Philadelphia committed an actionable tort by representing that the "reality show" exclusion would be applied differently than Philadelphia actually applied it. .............................................................30

       1.   Philadelphia fraudulently induced Megalomedia into renewing its policies with Philadelphia through a misrepresentation of how the "reality show" exclusion would be applied. ....................................................31

       2.   Philadelphia violated the Texas Insurance Code with its misrepresentations of how the "reality show" exclusion would be applied. ....................................................39

3.      Philadelphia violated the Texas Deceptive Trade Practices
        Act with its misrepresentations of how the "reality show"
        exclusion would be applied.......................................................41

4.      The Court should remand this case for determination of
        Megalomedia's damages associated with its tort claims. .........42

CONCLUSION ........................................................................................42

CERTIFICATE OF SERVICE ................................................................44

CERTIFICATE OF COMPLIANCE.........................................................44

# INDEX OF AUTHORITIES

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*,
 124 S.W.3d 154 (Tex. 2003) ........................................................................20

*Amedisys, Inc. v. Kingwood Home Health Care, LLC*,
 437 S.W.3d 507 (Tex. 2014) ........................................................................20

*Balandran v. Safeco Ins. Co. of Am.*,
 972 S.W.2d 738 (Tex. 1998) ........................................................................21

*Barto v. Shore Constr., LLC*,
 801 F.3d 465 (5th Cir. 2015) ........................................................................19

*Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*,
 974 F.3d 601 (5th Cir. 2020) ........................................................................19

*Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*,
 706 F.3d 419 (5th Cir. 2013) ........................................................................19

*Finger Oil & Gas, Inc. v. Mid-Continent Cas. Co.*,
 No. 22-50432, 2023 WL 581650 (5th Cir. Jan. 27, 2023) .................... 34, 37

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
 960 S.W.2d 41 (Tex. 1998) ..........................................................................31

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
 327 S.W.3d 118 (Tex. 2010) ........................................................................20

*Grain Dealers Mut. Ins. Co. v. McKee*,
 943 S.W.2d 455 (Tex. 1997) ........................................................................20

*Greenwood 950, L.L.C. v. Chesapeake La., L.P.*,
 683 F.3d 666 (5th Cir. 2012) ................................................................. 18, 19

*Group Hosp. Services, Inc. v. Daniel*,
 704 S.W.2d 870 (Tex. App.—Corpus Christi–Edinburg 1985, no writ) ......37

*Haase v. Glazner*,
 62 S.W.3d 795 (Tex. 2001) ..........................................................................31

*Harvey v. Grey Wolf Drilling Co.*,
    542 F.3d 1077 (5th Cir. 2008) ........................................................2

*Int'l Ins. Co. v. RSR Corp.*,
    426 F.3d 281 (5th Cir. 2005) .........................................................28

*Kennedy v. Sale*,
    689 S.W.2d 890 (Tex. 1985) ..........................................................40

*Luwisch v. Am. Marine Corp.*,
    956 F.3d 320 (5th Cir. 2020) .........................................................19

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*,
    811 S.W.2d 552 (Tex. 1991) ................................................... 21, 30

*RSUI Indem. Co. v. The Lynd Cos.*,
    466 S.W.3d 113 (Tex. 2015) .................................... 20, 21, 25, 38

*Spoljaric v. Percival Tours, Inc.*,
    708 S.W.2d 432 (Tex. 1986) ..........................................................31

*State Farm Life Ins. Co. v. Beaston*,
    907 S.W.2d 430 (Tex. 1995) ..........................................................39

*USAA Tex. Lloyds Co. v. Menchaca*,
    545 S.W.3d 479 (Tex. 2018) ................................................... 39, 40

*Wells v. Minn. Life Ins. Co.*,
    885 F.3d 885 (5th Cir. 2018) ................................................... 20, 21

*Wyly v. Integrity Ins. Sols.*,
    502 S.W.3d 901 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ..............37

**Statutes**

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 1332 ..............................................................................1, 2

28 U.S.C. § 1332(c)(1) ......................................................................1, 2

5th Cir. R. 28.2.3 ................................................................................ iv

5th Cir. R. 47.5 ..................................................................................37

Fed. R. App. P. 34(a) ............................................................ iv

Fed. R. Civ. P. 56(a)............................................................19

Tex. Bus. & Com. Code § 17.46(b) ......................................40

Tex. Ins. Code § 541.060(a)..................................................38

Tex. Ins. Code § 541.151(2) .................................................41

**Other Authorities**

*Docudrama*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/ docudrama (last visited Mar. 20, 2024).................22

*Documentary*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/documentary (last visited Mar. 20, 2024)..............22

*Docuseries*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/docuseries (last visited Mar. 20, 2024).................22

*Reality*, Merriam-Webster.com, https://www.merriam-
    webster.com/dictionary/ reality (last visited Mar. 20, 2024) ......................22

Case No. 23-20570

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

MEGALOMEDIA INCORPORATED; MEGALOMEDIA STUDIOS, L.L.C.;
MANSFIELD FILMS, L.L.C.; DBA HOLDINGS, L.L.C.,
*Plaintiffs-Appellants*

v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
*Defendant-Appellee*

_____

BRIEF OF APPELLANTS

_____

TO THE HONORABLE COURT:

Plaintiff-Appellants Megalomedia Incorporated ("Megalomedia"), Megalomedia Studios, L.L.C., Mansfield Films, L.L.C., and DBA Holdings, L.L.C. file this Brief of Appellants.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. Appellee Philadelphia Indemnity Insurance Company ("Philadelphia") filed this lawsuit against Megalomedia, Megalomedia Studios, L.L.C., Mansfield Films, L.L.C., and DBA Holdings, L.L.C. ROA.18. Philadelphia is a Pennsylvania insurance company with its principal place of business in Pennsylvania. ROA.20. It is thus a citizen of Pennsylvania for jurisdictional purposes. 28 U.S.C. § 1332(c)(1).

Megalomedia is a Texas corporation with its principal place of business in Texas. It is thus a citizen of Texas for jurisdictional purposes. 28 U.S.C. § 1332(c)(1). Megalomedia Studios, L.L.C., Mansfield Films, L.L.C, and DBA Holdings, L.L.C., are Texas limited liability companies. The sole member of Mansfield Films, L.L.C. is DBA Holdings, L.L.C. The sole member of both DBA Holdings, L.L.C. and Megalomedia Studios, L.L.C. is Jonathan Nowzaradan, a Texas citizen. Because their members are citizens of Texas, each of the L.L.C. appellants is a citizen of Texas. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079–80 (5th Cir. 2008). The district court thus had diversity jurisdiction under 28 U.S.C. § 1332.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the order from which the appeal is taken is a final order of a district court of the United States, disposing of all parties' claims.

## STATEMENT OF ISSUES

1. Megalomedia purchased insurance policies from Philadelphia to cover its television productions. Beginning in 2011, Philadelphia added an exclusion to the policies that excluded from certain coverage "any/all reality shows." Philadelphia considered shows involving an element of danger and less control over the environment while filming, such as when following law enforcement, to be excluded "reality shows." But Philadelphia was "okay with" other of Megalomedia's

documentary-type shows. After Megalomedia tendered claims made by participants of one of its weight-based, documentary-type shows, *My 600-lb Life*, Philadelphia declined coverage. Did Philadelphia incorrectly construe *My 600-lb Life* as a "reality show" subject to the exclusion?

2.    In response to inquiries from Megalomedia as to whether its documentary-type, reality-based shows would be excluded from coverage under the "reality show" exclusion, Philadelphia indicated that it was "okay with" some of Megalomedia's shows but not others. Philadelphia now contends that all of Megalomedia's shows were subject to the "reality show" exclusion. Did Philadelphia mispresent how it would apply the "reality show" exclusion such that it is liable for fraudulent inducement, DTPA violations, and/or Insurance Code violations?

STATEMENT OF THE CASE

A.    <u>Statement of Facts</u>

This case is about an insurance company, Philadelphia, that failed to stand by its words and provide the required coverage to its insured, Megalomedia. For over a decade, Megalomedia applied for full general liability coverage for its television productions. When Philadelphia issued insurance policies in response, Megalomedia understood that it was obtaining the coverage it sought. Megalomedia paid Philadelphia premiums for more than a decade. But when the time finally came to

3

provide the required coverage, Philadelphia denied Megalomedia's claim. As explained below, this denial was inconsistent with the parties' agreed understanding of the policy terms and Philadelphia's own conduct during the course of the parties' relationship.

1. <u>Megalomedia seeks general liability insurance coverage from Philadelphia.</u>

Megalomedia is a television production studio based in Austin, Texas. ROA.4847. Jonathan Nowzaradan, Megalomedia's president and executive producer, founded Megalomedia in 2003 with the goal of telling inspirational stories. ROA.4849. Over the past two decades, Megalomedia has produced a number of programs consistent with this goal. ROA.4849. One such show, *My 600-lb Life*, documents the weight-loss journey of morbidly obese individuals, many of whom had been turned down by hospitals for certain treatments. ROA.5001–02. Nowzaradan's father, a doctor with a relevant specialty, suggested that he could provide such treatment and that Nowzaradan could follow the patients throughout the process. ROA.5001–02. *My 600-lb Life* is one of many weight-based shows that Megalomedia has produced with the goal of inspiring others in a similar situation to try and get help. ROA.5001–02.

For a number of years, Megalomedia obtained insurance for its productions through Hartford. ROA.4997–98. In 2010, however, Hartford notified Nowzaradan that they would no longer be providing the general liability coverage Megalomedia

desired. ROA.4997–98. As such, Megalomedia was in the market for a new insurance carrier when Philadelphia presented a new opportunity for coverage. ROA.4997–98.

At the time, Philadelphia had recently created a new "film-production" insurance product it was seeking to market. ROA.4666–67. Philadelphia's marketing representative, Don Stalnaker, contacted Megalomedia's insurance broker, Jason McKinley, to discuss the film-production product and potentially obtain Megalomedia's business. ROA.4666–67. Although Philadelphia's film-production product contained several forms of insurance, the focus of the film-production product was general liability coverage. ROA.4781. This suited Megalomedia because general liability was the "most important" type of insurance coverage Megalomedia needed because it covered the most risk. ROA.4857. Megalomedia was particularly concerned about obtaining commercial general liability insurance coverage for its various productions. ROA.4857. As a result, Megalomedia, through its insurance broker, applied to Philadelphia for coverage under the film-production product. ROA.6011.

As part of the application process, Philadelphia required Megalomedia to submit a "Film Production Supplemental Application." ROA.6026. This Supplemental Application required Megalomedia to identify the "name and description for production(s) for which coverage is requested" as part of the general

liability section. ROA.6027. Megalomedia listed the productions *Heavy* and *Quintuplets by Surprise* on its original application, identifying them as "reality based TV shows/documentaries." ROA.6027. Philadelphia "approved" the applications as submitted, meaning that Philadelphia "quoted" and provided full general liability coverage for *Heavy*, *Quintuplets by Surprise*, and two other productions. ROA.5096, 6054. The Megalomedia account was the very first film-production insurance policy for Philadelphia's Austin office. ROA.6054.

2. <u>Philadelphia informs Megalomedia that it is "okay with" providing full general liability coverage for Megalomedia's non-dangerous productions but not for its dangerous "reality" shows.</u>

In 2011, Megalomedia applied for coverage for a new production, *Cartel City*. ROA.6114. Similar to the TV show *Cops*, *Cartel City* followed the "day-to-day life of the LaJoya Police Department." ROA.6116. Philadelphia declined coverage for *Cartel City*. ROA.6130.

In explaining why, Philadelphia distinguished *Cartel City* from Megalomedia's other productions—*Heavy* and *Quintuplets by Surprise*—that Philadelphia had already approved. ROA.6133. Specifically, a Philadelphia representative told Megalomedia's insurance broker that she "had underwriting review the info for this new project [*Cartel City*] and their response was it *sounds more like a reality show than a documentary* so we are not going to be able to add it to the policy." ROA.6133 (emphasis added).

Philadelphia then set up a mid-term change to Megalomedia's policy on June 3, 2011 to address its desire to not cover "reality shows." ROA.6130. The mid-term change stated that the policy "[e]xcludes any/all reality shows" from coverage for claims for "bodily injury" and "property damage" arising out of those shows. ROA.6130.

As of this mid-term change on June 3, 2011, Philadelphia had no intention of providing such coverage for "any/all reality shows." ROA.4793. But Philadelphia had not yet defined what it considered to be a "reality show" for purposes of the exclusion. ROA.4794–96; ROA.5231; ROA.5259–60. Philadelphia did not state, for example, that it considered the exclusion to apply retroactively to *Heavy*, *Quintuplets by Surprise*, or any of Megalomedia's productions other than *Cartel City*. Nor could it because those shows had already been approved. The exclusion would instead apply to future productions that Philadelphia considered to fit within the undefined term, "reality show." Indeed, at the time it implemented the mid-term exclusion, Philadelphia had no definition of what constituted "reality TV" or a "reality show" in the policy, in its underwriting guidelines, or in any other Philadelphia document. ROA.4794–96; ROA.5231; ROA.5259–60.

With no definition in place for "reality show," Philadelphia would simply communicate its rejection of coverage for an excluded "reality show" on a case-by-case basis in response to Megalomedia's applications for coverage and, in doing so,

would explain why that particular production was an excluded "reality show" as distinguished from Megalomedia's other productions. *See, e.g.*, ROA.5221; ROA.5227; ROA.5241–42; ROA.6128.

Philadelphia provided the first such clarification of what it considered a "reality show" when it implemented the mid-term exclusion and denied coverage for *Cartel City*. ROA.6144. In response to Megalomedia's protest that *Cartel City* was not a reality show but was instead a documentary, Stalnaker—the Philadelphia marketing representative who pitched the film-production product to Megalomedia's insurance broker—represented that Philadelphia was "okay with the other work that [Megalomedia was] doing, just not this particular project [*Cartel City*]":

ROA.6144. In his email, Stalnaker listed the dangers inherent with *Cartel City* before stating that Philadelphia was "okay" with Megalomedia's other shows,

meaning shows that Philadelphia "had already written the policy for"—the four productions on Megalomedia's original Supplemental Application. ROA.4799–4800; ROA.6144.

Philadelphia made this representation on June 6, 2011—three days after it had set up a mid-term change to Megalomedia's policy to exclude "any/all reality shows." ROA.6130; ROA.6144. Thus, three days after it determined it would not provide certain coverage for "reality shows," Philadelphia represented that it was "okay" with Megalomedia's existing productions other than *Cartel City*. ROA.6130; ROA.6144. Megalomedia's broker, Jason McKinley, communicated Philadelphia's position—that Megalomedia's other shows, including the weight-loss show *Heavy* and the other shows on Megalomedia's original application, were covered by Philadelphia—to Megalomedia. ROA.4683. Megalomedia relied on this representation to continue to purchase insurance policies from Philadelphia. ROA.4964–65; ROA.4995–96.

### 3. Megalomedia seeks further clarification of what Philadelphia considers to be a "reality show."

After receiving the above guidance from Philadelphia, Megalomedia again sought clarification regarding the language that its insurance policy "Excludes any/all reality shows." As Megalomedia considered renewing its policy with Philadelphia, it received a renewal quote from Philadelphia that stated that it was not the policy's intent to cover "Film and production of Reality Shows." ROA.6163,

6169. Concerned about the impact this language would have on coverage for its existing productions, Megalomedia sought clarification from Philadelphia. ROA.6182.

An email from one of Philadelphia's account representatives, Melissa Relf, to Philadelphia underwriter Jennifer Costantini reflects that Megalomedia asked Philadelphia about whether the new exclusion would apply to Megalomedia's productions in light of the language in the renewal quote regarding the policy's "intent":

| | |
|---|---|
| From: | **"Relf, Melissa"**    **CONFIDENTIAL** |
| To: | **"Costantini, Jennifer"** |
| Date: | 12/6/2011 1:45:27 PM |
| Subject: | FW: Megalomedia's Upcoming Projects Report; Path 5531721 |
| Attachments: | Megalomedia's Upcoming Projects.docx |
| | package.PDF |

Hi Jennifer,

The insured called me asking about the verbage on the renewal quote "Please note it is not this policy's intent to cover film and production of TV series and film and production of reality shows". They are concerned b/c they do produce documentary type shows which we knew about when we first wrote this policy last year. I realize we do not want to write actual reality shows. Also the Quints by Surprise documentary show is giong into it's fourth season which I would consider a "series". Can you provide some clarification in regards to your comment on the quote?

Also, attached is a list of upcoming projects. I have emailed the agent to provide descriptions on the new shows to make sure they fit into what we consider exceptable. I will forward this info to you upon receipt.

Thanks,

**Melissa Relf, CISR**
Senior Account Executive I
Philadelphia Insurance Companies
A member of the Tokio Marine Group

ROA.6182. After this inquiry, Philadelphia ultimately renewed Megalomedia's policy.

At this point, Megalomedia understood that its productions other than *Cartel City* had full general liability coverage. For example, Megalomedia's chief financial officer, Toni Westberry, testified that, consistent with the internal Philadelphia emails, Megalomedia's insurance broker, McKinley, "talked to someone at Philadelphia, and they had given him those same assurances" that Megalomedia's other shows were being covered. ROA.4912–13. Westberry, to whom McKinley conveyed this information, relied on it and continued to purchase insurance from Philadelphia as a result of these assurances. ROA.4968; ROA.4983–84.

4. <u>In 2013, Philadelphia restates its position that only shows with the element of danger would be excluded "reality shows" as distinguished from Megalomedia's other productions.</u>

In 2013, Philadelphia again clarified its understanding of what constituted an excluded "reality show" in its rejection of coverage for another of Megalomedia's productions. ROA.6343–46. Megalomedia sought coverage for its production, *Fugitive Recovery*, which followed U.S. Marshals tracking down fugitives. ROA.6346. As with *Cartel City*, Philadelphia determined that it would not provide coverage for *Fugitive Recovery* due to the element of danger and lack of control associated with the production. ROA.6344. Philadelphia then represented that the element of danger made *Fugitive Recovery* much different than Megalomedia's other productions such as its weight-focused productions of *Heavy*, *Half-Ton Teen*, and *Half-Ton Mom*:

> **From:** Costantini, Jennifer
> **Sent:** Thursday, January 31, 2013 4:33 PM
> **To:** Stalnaker, Don
> **Cc:** Mescall, Donna
> **Subject:** RE: Megalomedia Inc, 80742328 PathID: 6406670, Effective 12/1/2012
>
> CONFIDENTIAL
>
> Hello,
>
> We are not able to include the show with "riding with US marshals" due to the element of danger associated with their job.
>
> Unfortunately, the US marshalls show is much different then The prior shows such as "Heavy" "Half ton teen" "Half ton mom" "Tx Car wars " " Quints by surprise"
>
> **Jennifer Costantini**
> Commercial Underwriter - Sports & Rec. Division.

ROA.6344. Philadelphia thus drew a distinction between *Fugitive Recovery*, a dangerous show that would not be covered by the policy, and other Megalomedia productions like *Heavy*, *Half-ton teen*, *Half-ton mom*, that *were* covered by the policy.

Philadelphia provided this explanation to McKinley's office, who then communicated it to both Westberry and Nowzaradan, both of whom relied on this representation in continuing to renew Megalomedia's policies with Philadelphia. ROA.4966–67; ROA.4996–97. Based on the consistent clarifications from Philadelphia and the lack of any contrary definition of "reality show" in the policy, Megalomedia believed that it had full general liability coverage for its existing weight-focused productions but not its law enforcement productions. Megalomedia then continued to renew its policy with Philadelphia each year from 2011 through 2019 with that understanding. ROA.4915.

5. <u>Megalomedia repeatedly applies for coverage for *My 600-lb Life*, and Philadelphia never rejects Megalomedia's applications as it did with the excluded, dangerous "reality shows."</u>

Megalomedia first applied for coverage for *My 600-lb Life* in 2012. ROA.6250–51. *My 600-lb Life* is a successor to Megalomedia's other weight-focused shows like *Heavy*, which Philadelphia approved for coverage on Megalomedia's original Supplemental Application and which Stalnaker stated was a production that Philadelphia was "okay with." ROA.5043. Megalomedia made clear to Philadelphia what was involved in *My 600-lb Life* by providing a synopsis of the show with one of its Supplemental Applications. ROA.6261. In that synopsis, Megalomedia characterized *My 600-lb Life* as a show that "documents the weight-loss journey of five individuals." ROA.6261.

In response to these repeated applications for general liability coverage for *My 600-lb Life*, Philadelphia never once stated that it considered *My 600-lb Life* to be a "reality show" and would not be providing full general liability coverage like it did in response to Megalomedia's applications for *Cartel City* and *Fugitive Recovery*. ROA.4805–06; ROA.4967–68; ROA.5005; ROA.5011; ROA.5041; ROA.5111; ROA.5283–85. Instead, Philadelphia approved the applications and entered into an insurance contract with Megalomedia each time.

6. Philadelphia denies coverage after Megalomedia tenders a general liability claim based on *My 600-lb Life*.

Despite its pattern of approving applications for *My 600-lb Life*, Philadelphia denied general liability coverage when a claim associated with that show arose. Beginning in February 2020, a number of former participants of *My 600-lb Life* sued Megalomedia. ROA.10133. Megalomedia promptly notified Philadelphia of the lawsuit and requested that Philadelphia defend and indemnify Megalomedia for those claims. ROA.7080. Philadelphia, however, refused to provide coverage, claiming that *My 600-lb Life* is an excluded "reality show." ROA.10232–39. This was the first time Philadelphia ever communicated that it considered *My 600-lb Life* to be a "reality show" within the meaning of the exclusion implemented by the mid-term change almost a decade earlier. ROA.4805–06; ROA.4967–68; ROA.5005; ROA.5011; ROA.5041; ROA.5111; ROA.5283–85.

B. Procedural History

Philadelphia did not stop at denying coverage for the claims arising from *My 600-lb Life*. Instead, it sued Megalomedia in federal court, seeking a declaratory judgment that it owed no duty to defend and indemnify Megalomedia from the claims asserted by participants on *My 600-lb Life*. ROA.18. Megalomedia counterclaimed for breach of contract and various tort claims associated with Philadelphia's conduct. ROA.108; ROA.1795. Megalomedia raised two primary responses to Philadelphia's claim: (1) that its policies with Philadelphia provided

coverage for the underlying claims, or (2) alternatively, if the policies did not provide coverage, then Philadelphia was liable for previously misrepresenting to Megalomedia that it was "okay with" Megalomedia's weight-based productions and did not consider them "reality shows" subject to exclusion. ROA.108; ROA.1795.

Philadelphia moved for summary judgment on the threshold coverage question. ROA.199. The trial court granted summary judgment in favor of Philadelphia. ROA.1752. The trial court rejected Megalomedia's argument that the policy was ambiguous in its use of the undefined term "reality show," ROA.1378, ruling instead that the exclusion for reality shows was unambiguous and that Philadelphia had no duty to defend or indemnify Megalomedia against claims asserted in the underlying lawsuits. ROA.1761.

After this ruling, only Megalomedia's tort claims against Philadelphia remained. As such, the trial court granted Megalomedia's request to realign the parties, with Megalomedia as Plaintiff and Philadelphia as Defendant. ROA.4168. The trial court then conducted a February 2023 bench trial on Megalomedia's counterclaims alleging (1) fraudulent inducement, (2) violations of Chapter 541, Subchapter B of the Texas Insurance Code, and (3) violations of the Texas Deceptive Trade Practices Act. ROA.4648–5291. The trial court ultimately ruled in favor of

Philadelphia on the counterclaims and entered a take-nothing judgment against Megalomedia.[1] ROA.4519; ROA.4546. Megalomedia timely appealed. ROA.4598.

SUMMARY OF ARGUMENT

The trial court erred in concluding that the policy's exclusion of "any/all reality shows" unambiguously applied to *My 600-lb Life*. There is no single, standard definition of what constitutes a "reality show." The policy does not define "reality show." Philadelphia's underwriting guidelines do not define "reality show." And Philadelphia's underwriter could not define "reality show" or state whether various productions constituted a "reality show" within the meaning of the exclusion. Instead, the term is reasonably susceptible to multiple interpretations, rendering it ambiguous as a matter of law.

Because the term is ambiguous, Texas law requires that it be construed in favor of the insured, Megalomedia. Among the myriad ways to slice the term "reality show," Philadelphia provided a reasonable interpretation of the term in its evaluation of Megalomedia's Supplemental Applications. Specifically, Philadelphia internally distinguished between documentary-type shows and "reality shows." Both categories are reality-based, but Philadelphia considered "reality shows" to involve a lack of control over production and an element of danger that would remove them

---

[1] Judge Vanessa Gilmore originally presided over the case and issued the summary judgment ruling on the question of coverage. During the pendency of the remaining claims, Judge Gilmore retired and the case was assigned to Judge Alfred Bennett. Judge Bennett presided over the bench trial on Megalomedia's tort claims.

from Philadelphia's appetite for coverage. Philadelphia applied this distinction in denying coverage for *Cartel City* and *Fugitive Recovery* and in communicating that it was "okay with" Megalomedia's other productions including weight-based shows such as *Heavy*.

Thus, for purposes of the exclusion, a reasonable interpretation that favors Megalomedia and matches the parties' course of performance is that there were some categories of Megalomedia's reality-based shows—such as a docuseries like *My 600-lb Life* or *Quintuplets by Surprise*—that were covered under the policy, but there were other categories of Megalomedia's reality-based shows—such as law-enforcement type shows where Megalomedia would lack control over a dangerous environment—that were excluded from coverage as "reality shows." As to the latter category, any and all such shows—*Cartel City*, *Fugitive Recovery*—were excluded. And as to the former category, any and all such shows were covered.

To hold otherwise, would mean that *none* of Megalomedia's productions would have coverage from Philadelphia because all are reality-based in some capacity. Or worse, it would mean that Philadelphia had the unilateral right to decide whether it wanted to treat a production as an excluded "reality show" whenever a claim arose with no guidelines at all in how to make that determination. The best construction of the term "reality show" is that which Philadelphia used in approving and denying Megalomedia's Supplemental Applications. Under this proper

construction, Philadelphia is required to defend and indemnify Megalomedia from the claims arising from *My 600-lb Life*.

If the policy provides otherwise, then Philadelphia is liable for its misrepresentations regarding what it considered an excluded "reality show." The "reality show" exclusion arose as part of Philadelphia's denial of coverage for *Cartel City*. Philadelphia specifically explained that it would not provide coverage because *Cartel City* sounded more like a reality show. In response to Megalomedia's concerns that it produced documentary-type shows, Philadelphia stated that it was "okay with" Megalomedia's other productions—i.e., that it did not consider Megalomedia's other productions to be excluded reality shows. It was only after a claim arose decades later that Philadelphia first stated that it in fact considered *all* of Megalomedia's productions to be "reality shows" subject to the exclusion. Philadelphia concealed its true intention of how it would apply the "reality show" exclusion so as to continue to obtain Megalomedia's business. If Philadelphia is successful in avoiding coverage under the policy, it must be held liable for leading Megalomedia to believe that its shows would be covered when Philadelphia never intended to provide such coverage at all.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment. *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 668 (5th Cir. 2012).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As part of that analysis, the Court reviews *de novo* the district court's interpretation of a contract, including the question of whether the contract is ambiguous. *Greenwood 950, L.L.C.*, 683 F.3d at 668; *see also Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 (5th Cir. 2013) ("In Texas, the existence of ambiguity in a contract is a question of law, so the Court reviews whether the Ergon contracts were ambiguous *de novo*.").

Additionally, "[t]he standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 471 (5th Cir. 2015)). This Court will upset the district court's findings of fact only if it is 'left with the definite and firm conviction that a mistake has been committed.'" *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 606–07 (5th Cir. 2020).

<u>ARGUMENT</u>

A.    <u>The term "reality show" is ambiguous and must be construed in favor of Megalomedia.</u>

      1.    <u>A contractual term is ambiguous if it is subject to more than one reasonable interpretation.</u>

An insurance policy is a contract and is generally governed by the same rules of construction as all other contracts. *Gilbert Tex. Constr., L.P. v. Underwriters at*

*Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The primary concern when construing a contract is to ascertain the intentions of the parties as expressed in the document. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 514 (Tex. 2014). Unless the policy dictates otherwise, courts "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI Indem. Co. v. The Lynd Cos.*, 466 S.W.3d 113, 118 (Tex. 2015).

Terms in an insurance policy are often subject to conflicting constructions. This mere fact alone, however, does not render a term ambiguous. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("An ambiguity does not arise simply because the parties offer conflicting interpretations."). Instead, if only one party's construction is reasonable, the policy is unambiguous, and the court should adopt that party's construction. *See, e.g.*, *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex. 1997). "But if both constructions present reasonable interpretations of the policy's language, [the court] must conclude that the policy is ambiguous." *RSUI Indem. Co.*, 466 S.W.3d at 118.

The fact that a contract term is not defined does not make it *per se* ambiguous. "Words not defined in a contract are to be understood according to their plain and ordinary meaning." *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018). Additionally, when construing undefined contractual terms, courts may consider the

terms' commonly accepted meanings within the relevant industry. *RSUI Indem. Co.*, 466 S.W.3d at 121 n.1.

    2. <u>Ambiguous terms in an insurance contract must be construed in favor of the insured.</u>

A conclusion that an insurance policy is ambiguous gives rise to special rules of construction. Specifically, if a policy term is determined to be ambiguous, the court "must resolve the uncertainty by adopting the construction that most favors the insured." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991); *see also Wells*, 885 F.3d at 890 ("We construe ambiguities in Texas insurance contracts against the insurer."). This is true "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Nat'l Union*, 811 S.W.2d at 555. This rule of construction is "justified by the special relationship between insurers and insureds arising from the parties' unequal bargaining power." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 n.1 (Tex. 1998).

    3. <u>The plain, ordinary meaning of the term "reality show" establishes that it is subject to more than one reasonable interpretation.</u>

There is no set definition of the term "reality show." The insurance policy does not define the term. ROA.4794–96; ROA.5231; ROA.5259–60. Philadelphia's underwriting guidelines do not define it. ROA.4794–96; ROA.5231; ROA.5259–60. And the ordinary usage of the term does not reveal one standard definition.

For example, in the context of television programming, *Merriam-Webster* dictionary has different definitions for reality, documentary, docuseries, and docudrama:

- Reality: "television programming that features people (especially people who are not professional actors) dealing with real-life situations or participating in contrived activities (such as competitions)." *Reality*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/ reality (last visited Mar. 20, 2024).

- Documentary: "a presentation (such as a film or novel) expressing or dealing with factual events: a documentary presentation." *Documentary*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/documentary (last visited Mar. 20, 2024).

- Docuseries: "a documentary that is telecast in a series of programs." *Docuseries*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/docuseries (last visited Mar. 20, 2024).

- Docudrama: "a drama (as for television) dealing freely with historical events especially of a recent and controversial nature." *Docudrama*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/ docudrama (last visited Mar. 20, 2024).

Each type of production listed above involves real people rather than fictionalized characters. But there are different labels for different types of productions such that some shows could fit in only one category, or potentially more than one. For example, a docuseries may or may not be considered a "reality show" depending on the context. Indeed, Philadelphia's representative wrestled with this exact distinction in responding to Megalomedia's inquiry regarding the meaning of the reality show exclusion.

Upon receiving a call regarding the reality show exclusion, Melissa Relf asked the assigned underwriter, Costantini, for guidance. ROA.6182. Specifically, Relf stated that the "insured" was concerned about the language "b/c they do produce documentary type shows which we knew about when we first wrote this policy last year." ROA.6182. Relf, aware that Philadelphia did not want to cover "actual reality shows," sought clarification from Costantini as to whether Megalomedia's documentary-type shows would be covered or excluded as "actual reality shows":

**CONFIDENTIAL**

| From: | "Relf, Melissa" |
| To: | "Costantini, Jennifer" |
| Date: | 12/6/2011 1:45:27 PM |
| Subject: | FW: Megalomedia's Upcoming Projects Report; Path 5531721 |
| Attachments: | Megalomedia's Upcoming Projects.docx |
| | package.PDF |

Hi Jennifer,

The insured called me asking about the verbage on the renewal quote "Please note it is not this policy's intent to cover film and production of TV series and film and production of reality shows". They are concerned b/c they do produce documentary type shows which we knew about when we first wrote this policy last year. I realize we do not want to write actual reality shows. Also the Quints by Surprise documentary show is giong into it's fourth season which I would consider a "series". Can you provide some clarification in regards to your comment on the quote?

Also, attached is a list of upcominng projects. I have emailed the agent to provide descriptions on the new shows to make sure they fit into what we consider exceptable. I will forward this info to you upon receipt.

Thanks,

**Melissa Relf, CISR**
Senior Account Executive I
Philadelphia Insurance Companies
A member of the Tokio Marine Group

ROA.6182.

But because the term "reality show" is not susceptible to only one meaning in its ordinary usage, no one at Philadelphia could explain the difference between a reality show, an actual reality show, a documentary, or a documentary-type show. When asked at trial whether she knew what the difference was "between a documentary and a documentary-type show," Costantini responded, "No." ROA.5236. Similarly, when asked whether "a documentary-type show is acceptable under the underwriting guidelines," Costantini stated that she was "not sure" and that a "documentary-type show is up to interpretation." ROA.5236. When asked if she knew "what an actual reality show is," Costantini again responded, "No."

ROA.5237. And when asked if "there's a difference between a reality show and an actual reality show," Costantini answered, "I don't know." ROA.5237.

The reality is that different people can have differing opinions on what is a "reality show," a fact that Costantini admitted at trial. Costantini wrote policies as an underwriter for Philadelphia. ROA.5258. And in doing so, she would "determine whether or not an exclusion applied to an application." ROA.5258. But despite this experience, Costantini answered, "I don't know," when asked whether each of the following shows was a reality TV show, whether it was a documentary, and whether it was subject to the exclusion: *Cartel City*; *Heavy*; *My 600-lb Life*; *Quints by Surprise*; *Shipping Wars*; *My 600-lb Life, Where Are They Now?*; *Texas Car Wars*; *Half Ton Teen*; and *Half Ton Mom*. ROA.5258–60. If there was only one reasonable interpretation of the term "reality show," it would not be difficult for the underwriter assigned to Megalomedia's account to apply that definition to the above shows. But she could not do so because different shows can reasonably be categorized differently.

4.    Industry custom supports a finding that the term "reality show" is subject to more than one reasonable interpretation.

The different subgenres of reality-based productions are also recognized in the entertainment industry. *Cf. RSUI Indem. Co.*, 466 S.W.3d at 121 n.1 (authorizing courts to consider the terms' commonly accepted meanings within the relevant

industry when construing undefined contractual terms). Nowzaradan confirmed this at trial.

Nowzaradan has been in the entertainment industry for over twenty years. ROA.4988. He has served as an executive producer, a director, and many other roles during his time in the industry. ROA.4990–91. Nowzaradan also signed a 2011 application that Megalomedia submitted to Philadelphia seeking general liability coverage for its productions. ROA.4991. In that application, Megalomedia described the type of shows it produced as "Documentary film, docu/reality television pilots and series, both 22 minutes and 44 minutes." ROA.4991–92.

When asked the difference between a documentary film and a docu/reality television series, Nowzaradan explained that documentary "is the style of reality," and the "primary fact of what's going to distinguish them is whether it's episodic or not." ROA.4992. Specifically, the phrase "docu/reality television pilots and series" meant "reality television, but it's docu-style," meaning that "show's unstructured" in that Megalomedia would be "following along participants to see what happens and watch what unfolds." ROA.4992. As an example, the show *Quintuplets by Surprise* would be considered a docu/reality television series because each episode followed a family raising quintuplets and doing different tasks or activities that they had planned. ROA.4993. The same would be true for *My 600-lb Life*. ROA.5001–04.

Nowzaradan further explained that these unstructured, docu-style shows are just one type of sub-genre under the label, "reality TV." ROA.5006–07. Other sub-genres include, dating and relationship shows, such as *90-Day Fiancée*; remodel shows, such as *Fixer Upper*; rebuild shows involving cars, such as *Fast and Loud*; and competition/game shows like *Survivor* and *Amazing Race*. ROA.5006–07. There are also shows involving "structured reality," which is a very specific format that has a "predetermined outcome." ROA.5007. The structured programs differ from the "docu-drama" style shows that Megalomedia produced where "you don't, ultimately, know the outcome." ROA.5007. Nowzaradan thus confirmed that there are many different ways to construe the term "reality show" in the relevant industry.

5. <u>The parties' course of performance confirms that the term "reality show," as used in the exclusion, would not encompass Megalomedia's documentary-type, weight-based shows.</u>

The plain, ordinary meaning of the term and the relevant industry standards confirm that the term "reality show" is not susceptible to only one reasonable interpretation. One school of thought could categorize a docuseries as a "reality show," while another could categorize a docuseries as its own type of production distinct from reality shows. Reasonable minds can thus differ on what is in fact a "reality show." But that still leaves the question of whether the term "reality show" encompasses *My 600-lb Life* for purposes of the exclusion. It does not.

"Under Texas law, because the parties themselves are in the best position to know what was intended by the language used by them, the construction placed on an ambiguous contract by the parties will govern the court's interpretation of the agreement." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 295 (5th Cir. 2005). As such, "evidence of the course of dealing and performance of the contract" is admissible and can properly be considered "as an indication of the construction that the parties themselves put on" the ambiguous term. *Id.*

Here, the parties' course of performance confirms that they did not intend for Megalomedia's documentary-type, weight-based shows to be subject to the exclusion. Throughout the parties' relationship, Megalomedia would submit applications to Philadelphia identifying the productions for which it sought general liability coverage. (*See, e.g.*, ROA.6026; ROA.6250–51; ROA.7933.) When Philadelphia determined that a production would not be covered, such as with *Cartel City* and *Fugitive Recovery*, Philadelphia rejected the application and communicated that it would not be providing coverage for the specific production. (*See* ROA.4519 ¶ 14 ("Thus, there were pre-issuance determinations made by Philadelphia Indemnity's underwriters as to whether specific Megalomedia productions would be classified as 'documentaries,' and thus covered, or excluded from coverage based on their classification as 'reality shows' under the 'reality show' exclusion.").)

But Philadelphia never once rejected an application identifying *My 600-lb Life* or any of Megalomedia's other weight-based shows. ROA.4805–06; ROA.4967–68; ROA.5005; ROA.5011; ROA.5041; ROA.5111; ROA.5283–85. Instead, in explaining why it rejected *Cartel City* and *Fugitive Recovery*, Philadelphia stated that those shows were much different from Megalomedia's other productions and that Philadelphia was "okay with" Megalomedia's other productions, which included, at the time, *Heavy*. There is no principled distinction why Philadelphia would be "okay with" one weight-loss show, *Heavy*, but not another, *My 600-lb Life*.

The parties' course of performance for more than a decade thus confirms that some of Megalomedia's shows were "okay" for coverage while others were not. Philadelphia's litigation position that *all of* Megalomedia's productions are "reality shows" subject to the exclusion is inconsistent with its course of conduct throughout the parties' relationship and is an inappropriate construction in light of the ambiguity in the term.

6.    <u>The Court should render judgment in favor of Megalomedia on its breach-of-contract claim.</u>

The trial court erred in determining that the "reality show" exclusion unambiguously applied to *My 600-lb Life*. As shown above, the term "reality show" is subject to more than one reasonable interpretation, and the parties' course of performance confirms that Megalomedia's weight-based shows like *My 600-lb Life* would not be subject to the "reality show" exclusion. Texas law makes clear that

when a term is ambiguous, it is construed in favor of the insured, "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Nat'l Union*, 811 S.W.2d at 555. As such, the reality show exclusion should be construed narrowly in favor of coverage.

Moreover, there is no further factual development needed on the question of intent because the evidence of the parties' course of performance is already in the record through the factual development on the claims tried in the bench trial. This Court can thus conclude based on the record available that the policy provided coverage for the underlying claims arising from *My 600-lb Life* because that show is not a "reality show" within the meaning of the exclusion.[2] Alternatively, at a minimum, Megalomedia is entitled to a ruling that the term "reality show" is ambiguous and a remand for further proceedings consistent with that ruling.

B.   <u>If the policy does not provide coverage, Philadelphia committed an actionable tort by representing that the "reality show" exclusion would be applied differently than Philadelphia actually applied it.</u>

A ruling in Megalomedia's favor on the threshold question of coverage moots the remainder of Megalomedia's appeal. If, as Megalomedia contends, the reality show exclusion does not apply to *My 600-lb Life*, then Philadelphia's representations

---

[2] A partial remand would still be necessary, however, to determine the amount of reasonable and necessary attorney's fees Megalomedia would be entitled to recover as the prevailing party on a contract action under Chapter 38 of the Texas Civil Practice and Remedies Code.

to that effect would not be false and thus not actionable. But if the exclusion is applied to *My 600-lb Life*, then Philadelphia's representations that it was "okay with" Megalomedia's weight-based shows would be false, subjecting it to tort liability under Texas law.

1.  <u>Philadelphia fraudulently induced Megalomedia into renewing its policies with Philadelphia through a misrepresentation of how the "reality show" exclusion would be applied.</u>

Texas law imposes a duty to abstain from inducing another into a contract through the use of fraudulent misrepresentations. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

Those elements include a showing that (1) a false material representation was made, (2) the representation was known to be false when it was made, (3) the false representation was intended to be acted upon, (4) the false representation was relied upon, and (5) the false representation caused injury. *Formosa Plastics*, 960 S.W.2d at 47. A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving and with no intention of performing the

act." *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex. 1986); *see also* Dkt. 80 at 7. A false promise can be the contract itself. *Id.*

Here, Philadelphia mispresented that it was "okay with" certain of Megalomedia's productions and thus did not consider them excluded "reality shows." Philadelphia's specific misrepresentations and omissions include the following:

- June 3–6, 2011: When Philadelphia declined coverage for *Cartel City*, it implemented an exclusion that excluded "reality shows" from general liability coverage. ROA.6130. Philadelphia represented to Megalomedia's broker that the reason for the denial was that the show "sounds more like a reality show than a documentary" and provided guidelines indicating that Philadelphia would not cover "reality shows." ROA.6133. Stalnaker then offered a "better explanation" of the denial, i.e., an explanation of why the show sounded more like a "reality show" than a documentary. ROA.6144. Stalnaker's explanation focused on the danger associated with the show. ROA.6144.

- June 6, 2011: Stalnaker misrepresented to McKinley, Megalomedia's insurance broker, that Philadelphia was "okay with" Megalomedia's non-dangerous shows, indicating that Philadelphia did not consider those shows to be "reality shows" under the new exclusion. ROA.6144.

- December 2011: Megalomedia, through its insurance agent, asked Philadelphia about the scope of the "reality show" exclusion as it related to Megalomedia's productions. ROA.6182. In response, someone at Philadelphia falsely assured Megalomedia's agent that certain of Megalomedia's productions, including the weight-loss show *Heavy*, were covered. ROA.4912–13. Megalomedia's agent told Westberry about Philadelphia's assurances. ROA.4968; ROA.4983–84

- Philadelphia asked Megalomedia's agent about the nature of Megalomedia's weight-loss shows *Half-Ton Mom* and *Half-Ton Teen*—shows that were the "origins of *My 600-lb Life*." ROA.5027–29; ROA.5043. Nowzaradan provided the necessary information to Megalomedia's agent to answer the questions. ROA.5027–29; ROA.5043. After Megalomedia's agent answered Philadelphia, Megalomedia's agent informed Nowzaradan that Philadelphia accepted the projects for coverage. ROA.5027–29; ROA.5043.

- For all Supplemental Applications Megalomedia submitted from 2010 to 2019, Philadelphia never declined an application seeking general liability coverage for a weight-loss show, including multiple applications identifying *My 600-lb Life*, and instead continued quoting general liability coverage and issuing policies with general liability

coverage. ROA.4805–06; ROA.4967–68; ROA.5005; ROA.5011; ROA.5041; ROA.5111; ROA.5283–85. There was also no significant change in the premiums for general liability coverage after the implementation of the reality show exclusion.

- Philadelphia never communicated that it was changing its interpretation of "reality show" to encompass Megalomedia's weight-loss shows such as *My 600-lb Life* until it denied the claims giving rise to this case. ROA.4805–06; ROA.4967–68; ROA.5005; ROA.5011; ROA.5041; ROA.5111; ROA.5283–85.

The trial court concluded that these misrepresentations did not rise to the level of fraudulent inducement for two primary reasons. First, the trial court concluded that Megalomedia had constructive knowledge, or at least should have known, that *My 600-lb Life* was an excluded "reality show." ROA.4529 ¶ 50. Second, the trial court, citing *Finger Oil & Gas, Inc. v. Mid-Continent Cas. Co.*, No. 22-50432, 2023 WL 581650, at *3 (5th Cir. Jan. 27, 2023), concluded that Stalnaker's representation that Philadelphia was "okay with" Megalomedia's other productions after implementing the reality show exclusion was only "a general statement" that the policy provided coverage, "rather than a misrepresentation of specific policy terms." ROA.4533 ¶ 64. The trial court erred with each of these conclusions.

As to the issue of constructive knowledge, the trial court referenced circumstances in which Megalomedia acknowledged *My 600-lb Life* as reality TV when providing budgets and discussing other insurance policies through its television networks. ROA.4528. The trial court reasoned that these facts revealed that Megalomedia should have known "of the unambiguous reality TV exclusion and the fact that *My 600-Lb Life* was considered a reality TV show." ROA.4529–30.

But recognition that there can be *a* definition of "reality show" that encompasses *My 600-lb Life* does not mean that is *the only* reasonable interpretation. Instead, as explained, the term can be susceptible to more than one reasonable interpretation such that Megalomedia's acknowledgment of *My 600-lb Life* as reality TV in some circumstances is not dispositive of whether *My 600-lb Life* would be treated as a "reality show" within the meaning of the ambiguous exclusion. The relevant question is what Philadelphia led Megalomedia to believe it considered a "reality show." And the communications most contemporaneous to Philadelphia's implementation of the reality show exclusion clarified that some of Megalomedia's productions would not be subject to the reality show exclusion. Philadelphia's conduct in denying Megalomedia's claim and asserting that *all* of Megalomedia's productions are subject to the exclusion, however, indicates that Philadelphia's prior representations were false.

In light of Philadelphia's representations, Megalomedia did not and could not have known that Philadelphia would apply the reality show exclusion to *My 600-lb Life*. Year after year, Megalomedia submitted Supplemental Applications identifying the specific productions for which it sought coverage. When Philadelphia issued policies to Megalomedia in response, Megalomedia understood that it obtained the requested coverage. The fact that Philadelphia identified specific productions to exclude under the reality show exclusion—such as *Cartel City*—further confirmed that the general liability policies Philadelphia issued applied to the rest of the identified productions.

It was not until trial that Megalomedia learned that Philadelphia's underwriters did not actually review the information contained in the Supplemental Applications about the name and description of productions for which Megalomedia sought general liability coverage. Even more remarkably, even if Philadelphia's underwriters had decided that a particular show was subject to the exclusion, Philadelphia would have continued renewing the policy and accepting premiums without telling Megalomedia that the policy had "no effect by way of actual coverage." ROA.5268–70. Indeed, Costantini testified that even if she knew that an exclusion applied to a production in a supplemental application for a renewal, Philadelphia would still write the renewal and accept the premiums and that she

would not convey that to the insured because she, as an underwriter, did not convey anything to the insured. ROA.5268–70.

This reveals why the trial court's second conclusion, that the Stalnaker representation that Philadelphia was "okay with" certain productions was also in error. Because the term "reality show" is not defined, Megalomedia could not have known that Philadelphia would treat *My 600-lb Life* as a "reality show" subject to the exclusion. Megalomedia's only source to know whether a particular production would be excluded from coverage was Philadelphia's representations.

As such, Stalnaker's 2011 misrepresentation that Philadelphia was "okay with" Megalomedia's other production does relate to a specific policy term—the reality TV exclusion, which had just been implemented three days earlier and which formed the basis for the denial of coverage for *Cartel City. See Finger Oil & Gas, Inc.*, 2023 WL 581650, at *3.[3] Stalnaker's representation is actionable because it is "more [a] than [a] 'vague representation[]'" in that it addressed specific Megalomedia productions under a specific exclusion. *Wyly v. Integrity Ins. Sols.*, 502 S.W.3d 901, 908 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Group Hosp. Services, Inc. v. Daniel*, 704 S.W.2d 870, 876 (Tex. App.—Corpus

---

[3] Notably, *Finger Oil* is a per curiam decision which is not designated for publication and therefore is not binding precedent, *see* 5th Cir. R. 47.5; it is not a fraudulent inducement case like the instant case; and it is clearly distinguishable on its facts.

Christi–Edinburg 1985, no writ) (statement that medical procedure "was covered" sufficient to support DTPA violation).

The reality show exclusion removed the "most important" coverage for Megalomedia—full general liability coverage. ROA.4857. Stalnaker's representation applied directly to this critical reality show exclusion. It was not simply a general statement indicating that Megalomedia would have some ancillary coverage but not the most important coverage it sought. It was a specific representation intended ensure that Megalomedia kept its business with Philadelphia.

Philadelphia never told Megalomedia that it considered Megalomedia's weight-focused productions—*Heavy*, *Half-Ton Teen*, *Half-Ton Mom*, and, ultimately, *My 600-lb Life*—to be "reality shows." Instead, it falsely represented that it was "okay" with those productions. By declining coverage for *My 600-lb Life*, Philadelphia has now confirmed that it never intended to provide general liability coverage for any of Megalomedia's productions—it just wanted the premiums without giving any general liability insurance coverage in return. This conduct is actionable as fraudulent inducement, and the trial court erred in concluding otherwise.

2.  Philadelphia violated the Texas Insurance Code with its
    misrepresentations of how the "reality show" exclusion would be
    applied.

Philadelphia's misrepresentations also give rise to liability under the Texas

Insurance Code. An insurance policy is a contract that establishes the respective

rights and obligations to which an insurer and its insured have mutually agreed. *RSUI*

*Indem.*, 466 S.W.3d at 118. The Insurance Code supplements the parties' contractual

rights and obligations by imposing procedural requirements that govern the manner

in which insurers review and resolve an insured's claim for policy benefits. *See, e.g.*,

Tex. Ins. Code § 541.060(a).

The Insurance Code "grants insureds a private action against insurers that

engage in certain discriminatory, unfair, deceptive, or bad-faith practices, and it

permits insureds to recover 'actual damages . . . caused by' those practices, court

costs, and attorney's fees, plus treble damages if the insurer 'knowingly' commits

the prohibited act." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex.

2018). "Actual damages" under the Insurance Code "are those damages recoverable

at common law." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 435 (Tex.

1995).

An insured's claim for breach of an insurance contract is "distinct" and

"independent" from claims that the insurer violated its statutory duties. The general

rule is that an insured cannot recover policy benefits for an insurer's statutory

violation if the insured does not have a right to those benefits under the policy. *Menchaca*, 545 S.W.3d at 490. An insured can, however, recover policy benefits as actual damages under the Insurance Code even if the insured has no right to those benefits under the policy, if the insurer's conduct caused the insured to lose that contractual right.

One circumstance where this occurs is when an insurer misrepresents the terms of a policy. *Menchaca*, 545 S.W.3d at 490. An insurer that violates the statute by misrepresenting that its policy provides coverage that it does not in fact provide can be liable under the statute for policy benefits if the insured is "adversely affected" or injured by its reliance on the misrepresentation. Although the policy does not give the insured a contractual right to receive the benefits, the insurer's misrepresentation of the policy's coverage constitutes a statutory violation that causes actual damages in the amount of the benefits that the insured reasonably believed she was entitled to receive. *Menchaca*, 545 S.W.3d at 490; *see also e.g.*, *Kennedy v. Sale*, 689 S.W.2d 890, 891–92 (Tex. 1985).

Philadelphia violated the Insurance Code by misrepresenting that its policy provided coverage that it did not in fact provide—namely, that the reality show exclusion would apply to only a subset of Megalomedia's productions. Philadelphia's misrepresentations are actionable under each of the following Insurance Code provisions that Megalomedia has asserted claims under in this case:

Chapter 541, Subchapter B, Sections 541.051(1)(A), 541.051(1)(B), 541.051(4), 541.051(5), 541.061(1), 541.061(2).

3. <u>Philadelphia violated the Texas Deceptive Trade Practices Act with its misrepresentations of how the "reality show" exclusion would be applied.</u>

Finally, Philadelphia's misrepresentations also give rise to liability under the Texas Deceptive Trade Practices Act. The Insurance Code and the Texas Deceptive Trade Practices Act (DTPA) overlap to provide additional avenues to relief for insureds. Under the Insurance Code, a person "who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice: . . . specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment." *See* Tex. Ins. Code § 541.151(2).

Philadelphia violated the DTPA by misrepresenting that its policy provided coverage that it did not in fact provide. Philadelphia's misrepresentations in this case are actionable under each of the following provisions in Section 17.46(b) of the DTPA: Section 17.046(b)(5) and Section 17.46(b)(12). Additionally, Philadelphia's failure to inform Megalomedia that it consider *My 600-lb Life* to be a "reality show" under the "any/all reality shows" exclusion is actionable under DTPA Section 17.46(b)(24).

4. <u>The Court should remand this case for determination of Megalomedia's damages associated with its tort claims.</u>

The trial court erred in ruling that Philadelphia had not made an actional misrepresentation and that Megalomedia had constructive knowledge and should have known that the reality show exclusion would apply to *My 600-lb Life*. The trial court based its conclusion on the earlier incorrect interpretation (made by Judge Gilmore) that the reality show exclusion unambiguously applied to *My 600-lb Life*. As has been shown, the term "reality show" is ambiguous as a matter of law. Megalomedia thus reasonably believed, based on Philadelphia's representations, that it had the full general liability coverage it requested for certain productions— *My 600-lb Life*—and not others—*Cartel City* and *Fugitive Recovery*. As such, Megalomedia has established either (1) that its insurance policy provided coverage for the claims arising from *My 600-lb Life*, or (2) that Philadelphia committed an actionable tort in misrepresenting its intended application of the reality show exclusion. In the event that the Court reaches the tort claims, Megalomedia is entitled to a reversal and remand to determine the damages it incurred, including any treble damage and corresponding attorney's fees, because of Philadelphia's misrepresentations.

## CONCLUSION

For the above reasons, Megalomedia respectfully requests that the Court reverse the trial court's ruling that the reality show exclusion unambiguously applied

to *My 600-lb Life* and render judgment that the insurance policies in question provided the requested coverage. Megalomedia further requests a limited remand to determine the reasonable and necessary attorney's fees it is entitled to recover as the prevailing party on a contract action.

Alternatively, Megalomedia requests that the Court reverse the trial court's findings of fact and conclusions of law and remand the case for further proceedings to determine the damages Megalomedia has incurred as a result of Philadelphia's tortious conduct and the recoverable amount of attorney's fees.

Respectfully submitted,

SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300
(512) 495-6399 (Fax)

By: /s/ *Jane Webre*
    Jane M. N. Webre
    Texas Bar No. 21050060
    jwebre@scottdoug.com
    Santosh Aravind
    Texas Bar No. 24095052
    saravind@scottdoug.com
    Anthony Arguijo
    Texas Bar No. 24079781
    aarguijo@scottdoug.com

    COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I certify that on March 21, 2024, I electronically filed the foregoing Brief of Appellant, and it has been served on all registered counsel of record via the CM/ECF system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure.

*/s/ Jane Webre*
Jane Webre

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitations, Typeface Requirements, and Type-Style Requirements

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,505 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). I understand that a material misrepresentation in this certificate of compliance may result in striking the brief and in sanctions against the person signing the brief.

*/s/ Jane Webre*
Jane Webre

March 21, 2024.