**Flores Law PLLC**
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

November 4, 2025

Mr. Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

Re: No. 23-20570, *Megalomedia, Inc. et al. v. Philadelphia Indemnity Insurance Co.*

Dear Mr. Cayce,

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc), controls the error-presentation issues discussed at argument: "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* at 1075. The decision below cited and quoted this part of *Little*, ROA.1757, but failed to follow it.

*Little*'s framework warrants reversal here. Philadelphia failed to carry its "initial burden" because it never established what the policy phrase "reality shows" does and does not entail. It wasn't a matter of *disestablishing* ambiguity. It was a matter of *establishing* meaning in the first instance.

That had to be done—the meaning of "reality shows" had to be established—because the rest of Philadelphia's own summary-judgment submission (the underlying court filings) described *My 600-Pound Life* in ways that may or may not be excluded, depending on what "reality shows" means. They described it as *both* a "reality show" *and* a documentary. *See* Reply Br. at 6. Again, it was Philadelphia's own filings as a movant that made a construction of the "reality shows" term necessary. Yet Philadelphia never showed that "reality shows" *unambiguously* excludes film genres like documentaries. Philadelphia therefore failed to meet its "initial burden." *Little*, 37 F.3d at 1075. So the district court should have concluded that the motion for summary judgment "must be denied, regardless of the nonmovant's response." *Id.*

*Sentry Equities, Ltd. v. Allstate Life Ins. Co.*, No. 22-20024, 2022 WL 16549210 (5th Cir. Oct. 31, 2022) (per curiam), is inapposite. It doesn't apply because it wasn't an *insurer's* MSJ on an *insurer's* action to establish *exclusion*. It was an *insured*'s MSJ on the *insured's* action to establish *coverage*.

An insured can be faulted for showing nothing (or the wrong thing) about policy meaning *when they are the movant* on an issue the *insured* bears the ultimate burden for. That's *Sentry*.

But the insured cannot be faulted for showing nothing (or the wrong thing) when they are the *nonmovant* on an issue the *insurer* bears the ultimate burden for. That's *Little*, and that's this case.

Sincerely,

Chad Flores

Court's opinion be changed from 29 C.F.R. § 553.230 to 29 C.F.R. § 553.233, so that the footnote will read as follows:

> In determining each deputy's hourly wage in a given work period, the district court should multiply the deputy's monthly salary by twelve to get a yearly salary, including a two week paid vacation to which each deputy is entitled. The district court should then divide the yearly salary by the number of work periods in a year. The court should then divide the sum by the number of regular hours which may be worked in that work period according to 29 C.F.R. § 553.233. This will result in a determination of each deputy's appropriate hourly wage in the work period determined by the district court.

and that the mandate be reissued immediately as herein amended.

IT IS FURTHER ORDERED that plaintiffs' motion to dismiss and for assessment of fees and costs be DENIED, and that this Order be published.

**Wilma LITTLE, Plaintiff–Appellant,**

**v.**

**LIQUID AIR CORPORATION, Chevron Chemical Company, and Victor Manufacturing Company, Defendants–Appellees.**

**Linda CARTER, Mother and Next Friend of Anidra Catrone Carter, Plaintiff–Appellant,**

**v.**

**LIQUID AIR CORPORATION, Chevron Chemical Company, and Victor Manufacturing Company, Defendants–Appellees.**

**No. 90–1807.**

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1994.

Actions were brought against manufacturer of propylene gas used in welding, seller of gas, and manufacturer of welding torch to recover for wrongful death of welders who were killed in explosion after discovering leak in welding hose. The United States District Court for the Northern District of Mississippi, Neal B. Biggers, Jr., J., granted summary judgment, and appeal was taken. The Court of Appeals, 952 F.2d 841, affirmed in part, reversed in part and remanded. Upon granting en banc review, the Court of Appeals held that, under Mississippi products liability law: (1) assumption of risk doctrine barred recovery from manufacturer of torch, and (2) gas manufacturer and seller could not be held liable under theory that they failed to warn of dangers of nasal fatigue absent any evidence that welders in fact suffered from such fatigue.

Affirmed.

Johnson, Circuit Judge, with whom Politz, Chief Judge, joined, dissented and filed opinion.

**1. Federal Civil Procedure 🔑2544**

**Federal Courts 🔑766**

Summary judgment should be granted and will be affirmed by Court of Appeals when nonmoving party fails to meet its burden to come forward with facts and law demonstrating basis for recovery that would support jury verdict. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**2. Federal Civil Procedure 🔑2544**

Party moving for summary judgment must demonstrate absence of genuine issue of material fact, but need not negate elements of nonmovant's case. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**3. Federal Civil Procedure 🔑2544**

If moving party fails to meet initial burden of demonstrating absence of genuine issue of material fact, motion for summary judgment must be denied, regardless of nonmovant's response; however, if moving party meets its burden, nonmovant must go beyond

pleadings and designate specific facts showing that there is genuine issue for trial. Fed. Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**4. Federal Civil Procedure ⚖2543**

Factual controversies are resolved in favor of party opposing motion for summary judgment, but only when there is actual controversy, i.e., when both parties have submitted evidence of contradictory facts. Fed. Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**5. Federal Civil Procedure ⚖2544, 2546**

Nonmoving party's burden on motion for summary judgment is not affected by type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on essential fact that it could not support judgment in favor of nonmovant; abrogating *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167; *Trevino v. Yamaha Motor Corp.*, 882 F.2d 182; and *Miller-Schmidt v. Gastech, Inc.*, 864 F.2d 1181. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**6. Products Liability ⚖15**

Under Mississippi products liability law, both theories of negligence and strict liability require proof of causal connection between defective product and plaintiffs' injuries.

**7. Gas ⚖18**

Under Mississippi products liability law, neither manufacturer of propylene gas used in welding nor seller of gas could be held liable under theory that warning accompanying gas failed to warn of nasal fatigue, absent any evidence that welders who were killed in explosion in fact suffered from such fatigue and that such fatigue bore causal connection to their deaths; even alleged facts that welders did not evacuate area when they discovered leak in welding hose and that one welder lit cigarette only established that cause of death was failure to smell gas, not that cause of such failure was nasal fatigue.

**8. Federal Courts ⚖915**

Any challenge to ruling dismissing strict products liability claim on grounds of assumption of risk was deemed waived due to failure to address issue on appeal.

**9. Negligence ⚖105**

Assumption of risk is valid defense under Mississippi law.

**10. Products Liability ⚖27**

Under Mississippi law, assumption of risk is valid defense in products liability cases.

**11. Negligence ⚖105**

To extent that contributory negligence and assumption of risk are distinguished by degree, contributory negligence crosses the pale into assumption of risk when plaintiff's conduct is not merely negligent, or even grossly negligent, but instead is wilful, venturous challenge to fully appreciated danger to plaintiff's own self-interest and safety.

**12. Gas ⚖18**

Under Mississippi products liability law, assumption of risk doctrine barred recovery from welding torch manufacturer in connection with deaths of welders as result of explosion caused by leaking hose; when welders became aware of leak, they had hose removed from area but themselves remained, despite employer's specific instructions to evacuate immediately in case of leak.

---

Michael T. Lewis, Pauline S. Lewis, Lewis & Lewis, Clarksdale, MS, for Little and Carter.

John L. Low, IV, Watkins & Eager, Jackson, MS, for Liquid Air.

Frank W. Hunger, Marian S. Alexander, Lake, Tindall, Hunger & Thackston, Greenville, MS, for Chevron.

W. Swan Yerger, Gene D. Berry, Heidelberg, Woodliff & Franks, Jackson, MS, for Victor Mfg.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, KING, JOHNSON, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, and DeMOSS, Circuit

Judges.*

PER CURIAM:

[1] In this products liability case, we hold that the district court appropriately and fairly granted summary judgment for the defendants. The plaintiffs are the heirs of Marvin Joe Little and Charles Carter. Little and Carter were experienced welders working in the wingtank of a barge. At some point, a gas hose leading to their welding torch developed a leak. The welding torch was manufactured by defendant Victor Manufacturing Company; the gas was manufactured by defendant Chevron Chemical Company and sold by defendant Liquid Air Corporation. The plaintiffs contend that, because of nasal fatigue, Little and Carter did not smell the gas, and that Carter lit a cigarette, causing an explosion that resulted in their deaths.[1] The heirs assert that Chevron and Liquid Air are liable because the warning accompanying the gas failed to warn of nasal fatigue; and that Victor is liable because a defective torch caused a "flashback" and a tear in the gas hose line, which resulted in the gas leak, which was a proximate cause of the deaths. When these allegations were put to the test of summary judgment, however, the plaintiffs failed to come forward with any evidence supporting their theory of recovery, that is, evidence that Little and Carter actually suffered nasal fatigue and that nasal fatigue bore a causal connection to their deaths; they likewise failed to establish liability against Victor. In our opinion today, we emphasize that summary judgment should be granted and will be affirmed by this court when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict. We thus reject the reasoning of the panel and affirm the district court.

## I

In July 1988, Marvin Joe Little and Charles Carter were employed by Mainstream, Inc. where they were cleaning the wingtanks of a barge.[2] Both Little and Carter were experienced welders who, according to their employer, had been properly trained and instructed as to the proper use of propylene gas. In their work, they were using a cutting torch manufactured by defendant Victor. The torch was attached to two hoses, one for oxygen and one for propylene gas, both of which were connected to tanks on the main deck of the barge. The propylene gas was manufactured by Chevron, which supplied it to Liquid Air, which provided it to Mainstream through a distributor. Prior to distribution by Chevron, the propylene gas was odorized with ethyl mercaptan, which gives the gas the smell of rotten eggs.

Chevron had sold the propylene gas to Liquid Air in bulk tank truckloads and, with each delivery, provided Liquid Air with Chevron's Material Safety Data Sheet ("MSDS") that included the following warning:

> **Precautions if Material is Released or Spilled:** Eliminate all sources of ignition in vicinity of spill or released vapor. Evacuate the area immediately and do not allow anyone to return until it is safe to do so. Persons entering the area to correct the problem and determine whether it is safe for normal activities to resume must comply with all instructions in Special Protective Information.[3]

* Judge Duhé recused himself and did not participate in this decision. Judges Benavides, Stewart and Parker were not members of the court when this case was submitted to the court en banc and did not participate in this decision.

1. These are the allegations set forth in the plaintiffs' amended complaint that was before the district court. After the motion for summary judgment was filed, however, the plaintiffs moved to amend their complaint again to assert different facts and new theories. Even though this motion was denied, the plaintiffs continued to assert the facts and theories set forth in their rejected proposed amended complaint. Our inquiry, however, is limited to the summary judgment record and the plaintiffs may not advance on appeal new theories or raise new issues not properly before the district court to obtain reversal of the summary judgment. *Topalian v. Ehrman,* 954 F.2d 1125, 1132 n. 10 (5th Cir.1992).

2. The wingtank is a watertight compartment below the deck of the barge.

3. The warning also stated that the "product presents an extreme fire hazard," and the product should only be used "in well ventilated areas."

When Liquid Air sold the propylene gas to Mainstream under its own name through a distributor, it was accompanied by Liquid Air's MSDS that provided in part:

> STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED: Evacuate all personnel from affected area. Use appropriate protective equipment. Do not get liquid in eyes, on skin or clothing. Shut off source of leak if possible. Protect from ignition. Ventilate area thoroughly. If leak is in user's equipment, be certain to purge piping with an inert gas prior to attempting repairs. If leak is in container or container valve, contact the closest Liquid Air Corporation location.

Although Little and Carter were never specifically advised that propylene gas could cause nasal fatigue, every Mainstream employee who testified stated that he knew to evacuate the wingtank if they smelled gas or had a leak.

On July 8, 1988, Little and Carter returned from lunch at approximately 12:30 and climbed into the No. 9 wingtank to continue their work. The wingtank hatch was a manhole approximately 18 to 20 inches in diameter, and a part of that hatch was occupied with a ventilation fan. Earnest Hughes, a co-worker of Little and Carter, walked to the hatch of the No. 9 wingtank some few minutes after returning from lunch and was summoned by Little to get the torch and hose out of the wingtank because the hose was leaking gas. At that time, Carter was back into the wingtank so far that Hughes could not see him and Little was partway down the ladder leading into the fourteen-foot deep wingtank. Little was into the wingtank—his head beneath the hatch about a foot or two—when he told Hughes that there was a hole in the torch's gas line.

Hughes pulled the torch and gas lines out of the wingtank and then laid them on the deck of the barge. He noticed the hole in the gas line. Little, still on the ladder in the hole, then told Hughes to get a repair kit to fix the hose. Hughes left to get the repair kit and, about half a minute later, heard a noise. When he looked back, he saw the fan—which had been attached at the top of the hatch—being blown into the air and then saw Little being propelled out of the wingtank. Hughes ran for help and cut all the gas off. Little died immediately and Carter died several days later as a result of burns that he received in the explosion.

## II

### A

The families of Carter and Little initiated actions for damages resulting from the explosion. The actions were consolidated and, after some initial discovery, the complaints stated claims against Victor, Chevron, and Liquid Air. In the amended complaint,[4] the plaintiffs alleged that

> On July 8, 1988, Marvin Joe Little and co-employee Charles Carter were working in the hold of a barge doing repair work, including the use of a cutting and welding torch manufactured by Victor. Little was also using propylene (Fuel Gas) manufactured by Chevron and distributed and sold by Liquid Air. The hold was an enclosed area below decks of the barge constructed for the purpose of buoyancy. Except for a single hatch, there was no ingress or egress to this hold. Little and Carter discovered a gas leak and decided to remove the torch from the hold to repair the hose. A short time after the hose was removed, no longer smelling the gas and believing the area to be safe, Carter lit a cigarette. This source of ignition led to an explosion of the propylene gaseous mixture which blasted Little's body through the hatchway of the hold, killing him instantly. Carter was seriously burned by the explosion and died several days later.

With respect to defendant Victor, the amended complaint alleged that the gas leak was caused by the "defective and negligent design of the torch"; specifically, the torch was defective in that it had a leaking O-ring and a leaking check valve, which defects caused a flashback that lead to a leak in the gas hose.

4. The complaints in both actions are essentially the same and, for brevity, we refer to them both as the "amended complaint."

The amended complaint further alleged that the propylene gas manufactured and distributed by Chevron and Liquid Air was defective and unreasonably dangerous because

> exposure to this gas leads to nasal fatigue to the extent that a worker cannot reliably detect this gas by smell. At the time he lit the cigarette, Carter could no longer smell the gas because of nasal fatigue. Both Carter and Little were unaware of the propensity of Defendants' gas product to cause nasal fatigue and were further unaware that exposure to this gas reduces or eliminates the ability to smell the gas.[5]

After the parties had engaged in discovery, the defendants moved for summary judgment.[6] The plaintiffs responded, urging that they should be allowed to amend their complaint to assert different theories of liability and that, even without the proposed amended complaint, there was sufficient evidence from which a jury could reach a verdict in their favor. In a well-reasoned opinion, the district court granted the motions and dismissed the plaintiffs' claims. The district court first held that Chevron and Liquid Air were entitled to the bulk seller/sophisticated purchaser defense. With respect to Chevron and Liquid Air, the district court also held that the plaintiffs had failed to present proof of the inadequacy of the warnings and the causative nexus between the warning and the injury suffered. The district court finally held that the plaintiffs had failed to offer proof that the defective Victor torch was the proximate cause of their injury.

The panel[7] first held that the district court did not abuse its discretion in denying the plaintiffs' motion to amend their complaint.[8] 952 F.2d at 845–47. Next, observing that summary judgment is rarely appropriate in products liability cases, the panel held that the burden did not shift to the plaintiffs to produce summary judgment proof because the defendants did not discharge their burden to establish that the plaintiffs did not raise a genuine question of material fact. Bolstering this conclusion, the panel majority postulated a set of "facts"[9] that, according to the panel, would allow the plaintiffs to prevail

5. The amended complaint further alleged that Liquid Air and Chevron were strictly liable because they "are in the business of manufacturing and/or distributing the subject gas which is defective and unreasonably dangerous in that Defendants failed to warn of its propensity to cause nasal fatigue," and also liable "because they negligently manufactured and/or sold the subject gas and failed to warn the reasonably foreseeable user ... of the defective and unreasonably dangerous propensities of this gas."

6. After the close of discovery, after Chevron filed its motion for summary judgment and after the case had been set for trial, the plaintiffs moved to amend their complaint again. The proposed amended complaint significantly changed the theories of the case, both as to the facts and the law. The proposed amended complaint did not include the allegations that Little and Carter ever smelled the gas or that Carter lit a cigarette, igniting the gas. Further, while all of the previous complaints had relied solely on the theory that nasal fatigue and the failure to warn thereof had caused Little and Carter's deaths, the proposed amended complaint also asserted that the gas was defective because the

> odorant (ethyl mercaptan) which Defendant Chevron added to the odorless propylene oxidizes over time, which diminishes the ability of the human nose to smell it. In addition, the human nose is not an adequate safety device because the ability to smell varies among individuals; disease and upper respiratory infections interfere with the ability to smell, smoking diminishes the ability to smell, sensory distractions diminish the ability of one to detect dangerous odors; certain environments 'mask' a smell; and, some individuals have little or no sense of smell.

The proposed amended complaint further asserted that, as a result of the imperfection of the human nose, the defendants should have advised the use of electronic gas detectors in confined areas instead of allowing users to depend on their sense of smell. The district court denied the plaintiffs' motion for leave to amend.

7. The panel's initial opinion is reported at 939 F.2d 1293 (5th Cir.1991). That opinion was withdrawn and the panel's final opinion is reported at 952 F.2d 841 (5th Cir.1992). The differences between the two opinions are not material to our discussion here.

8. In the light of the late date at which the plaintiffs moved to amend their complaint and the extensive legal and factual changes included in the proposed amended complaint, we agree with the panel decision and affirm the district court's denial of the motion to amend for the reasons stated in the panel's opinion.

9. We question the panel's postulation because some of these necessary "facts" have no support in the record and are only speculation, not "facts" at all.

at trial in strict liability and negligence on the theory that the warning was inadequate concerning nasal fatigue: Little and Carter discovered the leak and caused the hose to be removed from the wingtank; they then could no longer smell the gas and, assuming the fan had dissipated the odor,[10] remained in the wingtank temporarily rather than following the leaky hose to the deck of the barge; the wingtank then exploded as they attempted to leave. Recognizing that circumstantial evidence is admissible in Mississippi to establish strict liability, the panel noted that evidence that Carter perhaps lit a cigarette is circumstantial evidence that he could no longer smell the gas;[11] evidence that Little was standing on the ladder to the wingtank is circumstantial evidence that he and Carter were attempting to leave.[12]

Based on this strained and unsupported factual scenario, the panel concluded that the warnings provided by Liquid Air and Chevron were not inadequate as a matter of law, but also not so conclusively adequate as to require summary judgment in their favor. In summary, the panel held that a "jury should determine whether the defendants' failure to warn that propylene can cause nasal fatigue was a breach of their duty to warn of *all* dangers of which they had actual or constructive knowledge." 952 F.2d at 850.[13]

With respect to defendant Victor, the panel held that the district court erred in holding that the allegedly defective torch was not the proximate cause of the accident because of the intervening conduct of the plaintiffs in failing to follow the warning to evacuate the tank immediately. The district court erred because there was evidence to question whether the failure of Little and Carter to evacuate immediately was negligence or, on the other hand, an attempt to follow the warning. 952 F.2d at 852.

Judge Garwood dissented. He argued that the plaintiffs failed to discharge their burden of coming forward with sufficient evidence to permit a jury to find in their favor because it was undisputed that Carter and Little knew of the gas leak, that they knew it was present in the wingtank and that the explosion occurred very shortly thereafter. Therefore, according to Judge Garwood, it was "purest speculation" to assume that Little and Carter were suddenly afflicted with nasal fatigue. Further, the warning was not heeded when Carter lit a cigarette and also when Little and Carter delayed their departure from the wingtank. Accordingly, Judge Garwood would have affirmed the district court.

On suggestion for rehearing en banc, a majority of this court reflected the view that because summary judgment was so plainly appropriate, en banc consideration was necessary so that district courts will not be misdirected from the lesson of *Celotex* and its progeny that summary judgment is and should be "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

10. Indeed, it might have, thus undermining the plaintiffs' sole theory that nasal fatigue was the reason the gas was not smelled. No evidence supports either speculative theory.

11. There was no probative evidence that Carter did light a cigarette. *See infra* at pp. 1077–78. Nevertheless, the lighting of a cigarette is an essential component of the plaintiffs' theory as presented to the district court and as it comes to us on appeal.

12. No evidence supports a finding that Little or Carter ever attempted to leave the wingtank. The record evidence shows that, from the time Little first directed Hughes to retrieve the hose from the wingtank and repair it, he stood on the ladder below the hatch. There is no evidence that he ever moved from that position until propelled onto the barge by the explosion. The only evidence as to Carter's position before the explosion is that he was so far in the wingtank that he could not be seen.

13. The question whether Liquid Air and/or Chevron had actual or constructive knowledge of the "nasal fatigue" phenomenon as it was alleged by the plaintiffs (an allegation each of them denies) is irrelevant in the light of the plaintiffs' failure to demonstrate that Little and Carter actually suffered from nasal fatigue and the failure to show any causal connection between nasal fatigue and the deaths of Little and Carter.

B

For many years, we and other circuits viewed summary judgment as a "disfavored procedural shortcut," applicable to a limited class of cases. *Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir.1993). *See Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1197 (5th Cir. 1986) (noting ambivalence toward summary judgment for fear that trial judges use it as "catch penny contrivance to take unwary litigants into its toils and deprive them of a trial"). Beginning with its summary judgment "trilogy," *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court, however, has made it clear that our earlier approach to Rule 56 was wrong-headed because it was simply inconsistent with the plain language of the rule.

The Supreme Court has instructed us that the purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). To be certain, Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (emphasis added). Plainly, Rule 56 means what it says: "judgment ... shall be rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added).

[2, 3] Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not *negate* the elements of the nonmovant's case. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see Lujan,* 497 U.S. at 885–86, 110 S.Ct. at 3187. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54.

[4] This burden is not satisfied with "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, by "conclusory allegations," *Lujan,* 497 U.S. at 871–73, 110 S.Ct. at 3180, by "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir.1994). We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.* *See Lujan,* 497 U.S. at 888, 110 S.Ct. at 3188 (resolving actual disputes of material facts in favor of nonmoving party "is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint.... It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege").

[5] Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[14] *Armstrong v. City of Dallas,* 997

14. Our cases have sometimes stated in dicta that summary judgment is generally not appropriate in certain types of cases, such as products liability or negligence. *See, e.g., Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990); *Trevino v. Yamaha Motor Corp.,*

F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.

Our application of Rule 56 today—mandated by the Supreme Court—finds support in principles of fairness and judicial economy, particularly in the light of backlogs in the district courts and the high cost of litigation. A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment. Nor should a defendant be required to bear the unnecessary costs of delay and trial to defend against a claim that has no merit. Neither party should be required to bear the costs of trying all of the issues in a case when some can and should be resolved on summary judgment. Nor is it fair to require other cases to languish on the district courts' trial dockets because of cases that present no genuine questions of material fact. As Judge Rubin stated for this court in *Fontenot,* 780 F.2d at 1195, "[T]rial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers."

Notwithstanding the long history of summary judgment procedure, some parties will always complain that summary judgment unfairly deprives a party of the right to have the case heard by the trier of fact. No one, however, should be heard to question the fairness of requiring a party to meet basic evidentiary and procedural burdens in the trial of a case. Summary judgment requires no more. If, after adequate time for discovery, a party cannot produce proof that it has facts to support its case, then the case should be resolved at that point, and this is true irrespective of the type of case.

With these principles in mind, we turn to examine this case.

C

**[6, 7]** The plaintiffs' claims, both before the district court and before this court, are framed by their allegations and theories reflected in the amended complaint—the propylene gas manufactured by Chevron and distributed by Liquid Air was defective *in only one respect:* the failure to warn of nasal fatigue.[15] In order to recover under this theory, obviously there must be a causal connection between the defect and the injury. *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d 688, 691 (Miss.1988) (plaintiff must show that adequate warning would have altered conduct); *Thomas v. Hoffman–La-Roche, Inc.,* 949 F.2d 806 (5th Cir.1992) (same); *Fairley v. American Hoist & Derrick Co.,* 640 F.2d 679, 681 (5th Cir.1981) (showing defect is not enough if it did not cause or contribute to cause of injury). *See also Willett v. Baxter International, Inc.,* 929 F.2d 1094, 1098 (5th Cir.1991) (defective aspect of product must cause injury in failure to warn case). The plaintiffs' argument fails because no evidence supports that Little or Carter suffered nasal fatigue and, consequently, there is no evidence that nasal fatigue was the proximate cause of their deaths.[16]

882 F.2d 182, 184–86 (5th Cir.1989); *Miller–Schmidt v. Gastech, Inc.,* 864 F.2d 1181, 1185 (5th Cir.1989). That dicta is essentially empty chatter, however, inasmuch as we have never reversed a district court's entry of summary judgment solely because it involved a particular class of allegations. In any event, we reject any suggestion that the appropriateness of summary judgment can be determined by such case classification.

**15.** The plaintiffs' allegations sound in negligence and strict liability, both of which require proof of a causal connection between the defective product and the plaintiffs' injuries. *See Daniels v. GNB, Inc.,* 629 So.2d 595, 600 (Miss.1993) (strict liability); *Ford Motor Co. v. Matthews,* 291 So.2d 169 (Miss.1974) (negligence). Because our analysis focuses on the absence of facts on this common element, we consider both claims together. *See Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464, 467 & n. 3 (5th Cir.1987).

**16.** In their motions for summary judgment, Liquid Air and Chevron asserted this absence of facts supporting the elements of the plaintiffs' theory of recovery. Because the moving parties do not bear the burden of proof on these issues at trial, they were not required to negate the existence of facts, and they satisfied their burden under *Celotex. See Fontenot,* 780 F.2d at 1195. The panel was mistaken and apparently applied an incorrect standard when it held to the contrary. 952 F.2d at 847. Under *Celotex,* the bur-

The plaintiffs concede that they offered no direct evidence that Little and Carter ever actually suffered from nasal fatigue. They argue, however, that we can infer that Carter and Little suffered nasal fatigue from the facts that they did not evacuate and that Carter lit a cigarette. Any inference drawn from these facts, even assuming that the underlying facts are supported in the record, at best proves only that the cause of their injuries was the failure to smell the gas, not that the cause of their failure to smell the gas was nasal fatigue. Thus, evidence establishing a causal connection between the alleged defect in the warning and the injury suffered is lacking.

The facts of this case fail to reveal any explanation for the conduct of Little and Carter or the cause of the accident. Indeed, the evidence does not reveal with any degree of certainty whether Carter and Little did or did not smell the gas.[17] In this respect, the record is clear on only one point: they were aware of the gas leak because they had discovered the hole in the gas hose. Beyond that, the facts in the record lead only to speculation as to why Little and Carter did not immediately evacuate the wingtank when they knew of the gas leak. Nasal fatigue is only one speculative theory, neither more nor less supportable in this record than any of the other speculative theories.[18]

There was, for example, testimony speculating that the gas may have sufficiently dissipated so that it was on the floor and could not be smelled; there was testimony speculating that the ventilating fan may have drawn out the odor from the tank; and there was testimony speculating that the odorant may have failed altogether. Furthermore, it is equally easy to speculate that Little and Carter may have smelled the gas but remained in the tank temporarily rather than climbing out because they did not anticipate an igniting source.[19]

Moreover, when placed in the context of this case, the testimony of the plaintiffs' expert on nasal fatigue, Charles Phillip Colver, does not support nasal fatigue as a theory explaining why Little and Carter remained in the wingtank.[20] He testified that whether and when nasal fatigue may occur depends on the length of time of exposure and the strength of the odorant, as well as the particular individual who is exposed to the odorant. Yet, the record is silent concerning how any of these factors apply in this case. The record contains no facts concerning time of exposure,[21] the volume of the gas leaked, the temperature, the effect of the ventilation fan and, consequently, the strength of the odorant at the time of exposure. Nor do we know to what extent Little's and Carter's individual olfactory senses were susceptible to the phenomenon of nasal fatigue.

Finally, we cannot infer that Carter and Little smelled the gas from the alleged fact that Carter lit a cigarette because no evidence was adduced before the district court

den therefore shifted to the plaintiffs to come forward with evidence that can uphold a jury verdict. The plaintiffs, however, clearly failed to meet this burden.

17. We note, however, that, in their rejected amended complaint, the plaintiffs have withdrawn the allegation that Carter and Little smelled the gas, an omission that would be fatal to the nasal fatigue theory.

18. At en banc oral argument, the plaintiffs' counsel agreed that, assuming that Little and Carter failed to smell the gas, that failure could have been caused by nasal fatigue, the ventilation system, a failure of the odorant or other reasons.

19. Speculation concerning such grossly negligent conduct could be fueled by testimony that, three weeks before the accident, Little had been reprimanded for actually using an oxygen torch to blow-clean his workplace, conduct that the employer characterized as dangerous. Therefore, it is possible that, as long-time, experienced welders constantly exposed, without accident, to the dangers of gas in confined areas, Little and Carter had become indifferent to routine safety precautions that would have saved their lives.

20. Colver merely opined that nasal fatigue happened in this case because "it always happens," although he did not know the degree to which it occurred.

21. The testimony is undisputed that the lunch hour ended at 12:30 and that the explosion occurred at approximately 12:45, although the plaintiffs' counsel acknowledged at oral argument that these times were "best guestimates."

that Carter did light a cigarette.[22] At best, the record shows that Carter was a smoker, that he had smoked earlier in the day, that he bought a pack of cigarettes and perhaps a lighter at lunch and that there were smoked cigarette butts on the floor of the wingtank after the explosion.[23] These facts, however, are not evidence sufficient from which a jury could conclude that the source of the ignition was Carter's attempt to light a cigarette in the wingtank. For example, there is no evidence that there was an unsmoked cigarette, or parts of an unsmoked cigarette, on the floor of the wingtank; [24] no evidence that the flash explosion would have destroyed the cigarette that Carter allegedly tried to light; no evidence regarding whether a cigarette lighter or matches were found in the wingtank; [25] and no evidence that an opened, new pack of cigarettes with one missing was found in the wingtank or on Carter.

[8–12] In sum, even if it is assumed that Carter and Little did not smell the gas, there is no evidence that fact would support a jury's conclusion that nasal fatigue was the reason. The record simply supplies no answers of any kind whatsoever, and does not begin to suggest which of the speculative theories for their remaining in the tank is most plausible. In the absence of evidence on the various points we have noted above, nasal fatigue remains only one of many speculative reasons why Carter and Little remained in the wingtank, knowing that there had been a gas leak.[26] Consequently, the

22. The absence of evidence supporting the theory that Carter lit a cigarette is underscored by the plaintiffs' last-minute efforts to amend their complaint and withdraw this allegation. These efforts suggest that the plaintiffs either must have assumed that they could not prove that Carter lit a cigarette or that the lighting of the cigarette supplied the defendants with possible defenses to the plaintiffs' claims.

23. The record also shows that Carter had a lighter for his torch in the wingtank, but that lighter was still in his trousers pocket after the explosion. It is inconceivable that he would have been able to put the igniter back in his pocket after the explosion.

24. The plaintiffs' nasal fatigue expert testified that no individual cigarettes were found in the wingtank, although the source of his information is unclear.

25. The plaintiffs' nasal fatigue expert also testified that "there was found matches that he obtained during the lunch hour," although he does not state where they were found. Also, he testified that Carter purchased a cigarette lighter at lunch, but there was no further evidence concerning the lighter.

26. The plaintiffs, as we have noted, also asserted claims against Victor in strict liability and negligence. The district court granted Victor's motion for summary judgment on the grounds that (1) with respect to the negligence claim, Carter and Little's failure to evacuate and Carter's lighting a cigarette were superseding causes that relieved Victor of liability and, (2) with respect to the strict liability claim, Carter and Little assumed the risk by failing to evacuate the wingtank.

On appeal, the plaintiffs devote hardly any space or time to their claims against Victor—some two-plus pages in their opening brief, none in their reply brief, and none in their supplemental en banc brief. To be sure, they do not even address the district court's ruling dismissing the strict liability claim on grounds of assumption of risk; any challenge to the district court's ruling on that point is therefore deemed waived. *United States v. Valdiosera–Godinez,* 932 F.2d 1093, 1099 (5th Cir.1991). Although at en banc argument the plaintiffs disavowed any intent to completely abandon their claims against Victor, we note that they spent no time addressing those claims. Indeed, in an effort to bolster their argument that the gas itself was defective because of odorant fade, they seemed to embrace the opinion of Victor's expert that the tear in the gas line was caused by an external heat source at some earlier time in the morning and was not caused by a defective torch.

Assumption of the risk is a valid defense under Mississippi law. *See Saxton v. Rose,* 201 Miss. 814, 29 So.2d 646 (1947). Notwithstanding the sometime musings of the Mississippi Supreme Court concerning the continued vitality of the defense in the light of contributory negligence and Mississippi's adoption of comparative fault, *see Braswell v. Economy Supply Co.,* 281 So.2d 669 (Miss.1973), the doctrine has been reaffirmed in unequivocal terms, *Nichols v. Western Auto Supply Co.,* 477 So.2d 261 (Miss.1985), and actually extended to apply to products liability cases. *Id.* In its most recent pronouncements, the Mississippi Supreme Court, sitting en banc, reaffirmed the doctrine, *McDaniel v. Ritter,* 556 So.2d 303 (Miss.1989), with only one justice dissenting. 556 So.2d at 319 (Sullivan, J., dissenting).

To the extent that contributory negligence and assumption of the risk are distinguished by degree, contributory negligence crosses the pale into assumption of risk when the plaintiff's conduct is not merely negligent—or even grossly negligent—but instead, the plaintiff's conduct is a wilful, venturous challenge to a fully-appreciated danger to his own self-interest and safety. This

district court was correct in determining that the plaintiffs failed to satisfy their burden of coming forth with evidence that would support a jury verdict.

III

In conclusion, we reiterate that, as the case was pled and presented to the district court, the plaintiffs based their sole theory of recovery on the premise that Little and Carter suffered from nasal fatigue and that their deaths resulted from Liquid Air and Chevron's failure to warn them of this phenomenon. In response to motions for summary judgment, it was therefore incumbent upon them to present evidence—not just conjecture and speculation—that nasal fatigue did occur and that it bore some causal connection with the deaths of Little and Carter.

After the completion of discovery and extensive briefing here and in the district court, however, these salient facts emerge: (1) there was a gas leak in the wingtank; (2) Carter and Little knew of the gas leak; (3) there was an explosion; and (4) if Carter and Little had followed their employer's instructions, and the warning provided by the defendants, to evacuate in the event of a leak, they would not have died. Beyond these facts, what happened, why it happened, and how it happened is only speculation. The plaintiffs simply did not meet their burden to adduce evidence upon which a juror could determine what caused Little and Carter to ignore explicit warnings and safety precautions to evacuate the wingtank when they discovered a gas leak.

Although the panel majority attempted to assume facts and present a theory upon which the plaintiffs might have recovered, it was not free to amend the plaintiffs' pleadings or to assume facts that might be proved but are not established by the record. The absence of evidence to support the plaintiffs' theories of recovery made this case clearly and plainly appropriate for summary judgment. The district court fairly and thoroughly considered the plaintiffs' claims and determined that the complaint should be dismissed. The district court was correct and is therefore

AFFIRMED.

JOHNSON, Circuit Judge, with whom POLITZ, Chief Judge, joins, dissenting:

The majority opinion herein does not contest the panel majority's principal conclusion. That conclusion was that there was a genuine issue of material fact as to whether the warnings on this product were inadequate because they did not warn of the danger that "nasal fatigue" could degrade an individual's ability to detect the presence of the odorized gas. 952 F.2d 841, 850 (5th Cir.1992). Instead, the majority concludes that the evidence that the decedents were affected by nasal fatigue

distinction is reflected by Mississippi's definition of the elements of assumption of risk: "(1) Knowledge on the part of the injured party of a condition inconsistent with his safety; (2) appreciation by the injured party of the danger of the condition; and (3) a deliberate and voluntary choice on the part of the injured party to expose his person to that danger in such a manner as to register assent on the continuance of the dangerous condition." *Alley v. Praschak Machine Co.*, 366 So.2d 661 (Miss.1979).

In this case, as pled and argued by the plaintiffs, it is undisputed that Little and Carter knew that Victor's malfunctioning torch had caused a gas leak that created an imminently dangerous situation. Their knowledge of the gas leak, alleged to have been caused by Victor, and the specific instructions directly given to them by their employer to evacuate immediately under these circumstances, combined with their experience as welders, put them "in possession of fact[s] from which [they] would be legally charged with appreciation of the danger." *Alley v. Praschak Machine Co.*, 366 So.2d 661 (Miss. 1979). Finally, the undisputed facts show conclusively that Little and Carter, accepting this known danger, chose not to evacuate but instead remained in the wingtank. Their knowledge and experience taught *only* that they should evacuate immediately upon learning of a gas leak; they nonetheless chose to risk the danger and stayed in the wingtank after they had full knowledge of the torch's malfunction.

Given these undisputed facts, and given the fact that the plaintiffs have effectively waived the district court's application of the assumption of risk doctrine to these facts, it is clear that this legal principle bars the plaintiffs' recovery against Victor in all respects. Although the district court dismissed the negligence claim on another ground, it is appropriate for us to affirm the district court on any basis supported by the record. *Morales v. Department of Army*, 947 F.2d 766 (5th Cir.1991). We thus affirm the district court's entry of summary judgment in favor of Victor.

and that nasal fatigue bore a causal relation to the accident was too speculative to survive summary judgment. Maj. op. at 1071.

However, there was circumstantial evidence to support both of these conclusions.[1] That evidence showed that the decedents initially smelled the gas in that they discovered the leak. There was also testimony that nasal fatigue is a phenomenon that always occurs, at least to some extent, and that it works to diminish your ability to detect an odor. Additionally, there was evidence that Carter lit a cigarette some time after the leak was discovered which suggests that the decedents could no longer smell the gas.[2] From this circumstantial evidence, a jury could readily infer that the decedents' inability to smell the gas, which was obviously present in sufficient quantities to cause the explosion, was caused, at least in part, by nasal fatigue.

Viewed in a light most favorable to the plaintiffs, this writer concludes that this view of the evidence was reasonable, not merely speculative, and for a jury to accept or reject. *See Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.,* 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (in reviewing a summary judgment, we must review the evidence and any inferences to be drawn therefrom in a light most favorable to the non-moving party). If this view of the evidence is accepted, then it would be sufficient to raise a genuine issue of material fact as to whether the decedents did, in fact, experience nasal fatigue and whether this bore a causal relation to the accident. Fed. R.Civ.P. 56(c). For these reasons, and for the reasons stated in the panel majority opinion, this writer adheres to the view that summary judgment in this case was inappropriate.

Even if this conclusion is incorrect, though, it is difficult to see why this case merited en banc review. This case announces very little new law. Instead, it simply reiterates the familiar summary judgment standard flowing from the Supreme Court's trilogy of summary judgment cases and then applies that standard to the facts of this case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The only real difference between the majority and the dissent herein is the application of the facts of this particular case to that familiar standard. This hardly seems worthy of en banc consideration.

For this additional reason as well, this writer dissents.

1. Because direct evidence of the facts that underlie a strict liability claim is seldom available, Mississippi law has determined that circumstantial evidence of the allegations in a strict liability case is competent proof. *BFGoodrich, Inc. v. Taylor,* 509 So.2d 895, 903 (Miss.1987).

2. The majority attacks the strength of the evidence supporting the view that Carter lit a cigarette in the tank and that this ignited the gas. The evidence shows, however, that Carter was a smoker, that he had purchased cigarettes and perhaps a lighter earlier that day and that there were smoked cigarette butts on the floor of the wingtank after the explosion. Moreover, as the problem with the welder had caused a break in the work, it is not unlikely that Carter would take advantage of that work stoppage to smoke a cigarette. Finally, there was testimony that there was no other ignition source in the tank which could have set off the explosion which led witnesses to conclude that Carter must have lit a cigarette. Surely, from this circumstantial evidence, a jury could reasonably conclude, and not just speculate, that Carter did, in fact, light a cigarette.

**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Will Arthur PALMER, Defendant–Appellant.**

**No. 93–8775.**

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1994.

Rehearing Denied Dec. 15, 1994.

Defendant was convicted in the United States District Court for the Western Dis-